SIGAL CHATTAH, ESQ.
Nevada Bar No.: 8264
CHATTAH LAW GROUP
5875 S. Rainbow Blvd #203
Las Vegas, Nevada 89118
Tel: (702) 360-6200
Fax: (702) 643-6292
Chattahlaw@gmail.com
*Counsel for Plaintiffs*

JOSEPH S. GILBERT, ESQ.
Nevada Bar No.: 9033
ROGER O'DONNELL, ESQ.
Nevada Bar No.: 14593
JOEY GILBERT LAW
201 W. Liberty Street, Suite 210
Reno, Nevada 89501
Tel: (775) 284-7000
Fax: (775) 284-3809
Joey@joeygilbertlaw.com
*Co-Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| CALVARY CHAPEL LONE MOUNTAIN, a Nevada Non-profit Organization,<br><br>Plaintiffs,<br><br>vs.<br><br>THE HONORABLE STEPHEN F. SISOLAK, in his official capacity as Governor of the State of Nevada, AARON DARNELL FORD, in his official capacity as the Attorney General of the State of Nevada, JUSTIN LUNA, in his official capacity as Chief of the Nevada Division of Emergency Management; DOES 1 through 100.<br><br>Defendants. | Case No.: 2:20-cv 00907 RFB-VCF<br><br><br>**PLAINTIFFS' EMERGENCY MOTION FOR PRELIMINARY INJUNCTION** |

SIGAL CHATTAH, ESQ.
NV Bar No.: 8264
CHATTAH LAW GROUP
5875 S. Rainbow Blvd. #204
Las Vegas, Nevada 89101
(702) 360-6200
(702) 643-6292
Chattahlaw@gmail.com
Attorney for Plaintiffs

JOSEPH S. GILBERT, ESQ.
Nevada Bar No.: 9033
ROGER O'DONNELL, ESQ.
Nevada Bar No.: 14593
JOEY GILBERT LAW
201 W. Liberty Street, Suite 210
Reno, Nevada 89501
Tel: (775) 284-7000
Fax: (775) 284-3809

Co-Counsel for Plaintiffs

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| CALVARY CHAPEL LONE MOUNTAIN, a Nevada Non-profit Organization, <br><br> Plaintiffs, <br><br> vs. <br><br> THE HONORABLE STEPHEN F. SISOLAK, in his official capacity as Governor of the State of Nevada, AARON DARNELL FORD, in his official capacity as the Attorney General of the State of Nevada, JUSTIN LUNA, in his official capacity as Chief of the Nevada Division of Emergency Management; DOES 1 through 100. <br><br> Defendants. | Case No.:2:20-cv 00907 RFB-VCF <br><br><br><br><br><br> **DECLARATION OF SIGAL CHATTAH, ESQ. PURSUANT TO LR-7.4** |

I, Sigal Chattah, Esq. declare and state as follows:

1.      I am Plaintiffs' Counsel in the matter *sub judice,* and am duly licensed to practice in all Courts of the State of Nevada.

2.      The facts set forth herein are true of my own personal knowledge, and if called upon to testify thereto, I could and would competently do so under oath.

3.      The matter *sub judice* involves the closure of places of worship in the State of Nevada following Executive Directive 20-013 issued by Defendants herein.

4.      That on May 14, 2020, 190 Church's requested Governor Sisolak allow places of worship to open under the Free Exercise Clause of the First Amendment.

5.      Movant herein, is a Church known as Calvary Chapel Lone Mountain appearing by the through CHATTAH LAW GROUP, located at 4295 North Rancho Drive, Las Vegas NV 89130.

6.      That Defendants addresses are as follows Grant Sawyer State Office Building 555 East Washington Ave, Suite 5100, Las Vegas NV 89101 (775) 684-5670.

7.      That on March 14, 2020 Defendants received correspondence from 190 religious institutions requesting immediate relief to open their churches following Phase I of Nevada restrictions and were ignored by Defendants.

8.      That due to the exigent nature of the matter and constitutional implications and violations as stated herein, it is simply impracticable to contact each administrator involved in this action. Notwithstanding same, service of process of the Complaint, and the following Emergency Motion for Preliminary Injunction will be personally served upon Defendants immediately upon filings or shortly thereafter.

///

9.    Under NRS 53.045, I declare under penalty of perjury that the foregoing is true and correct.

Dated this 21st day of May, 2020

/s/
Declarant
SIGAL CHATTAH, ESQ.

TABLE OF AUTHORITIES .................................................................................... iii

I.     MOTION FOR PRELIMINARY INJUNCTION……………………………….6-30

II.    JURISDICTION ……………………………………………………………..7

III.   INTRODUCTION ..................................................................................7

IV.    STATEMENT OF FACTS ...............................................................8-14

       A.  DESCRIPTION OF ACTION

       B.  DEFENDANTS' DIRECTIVES

V.     LEGAL ARGUMENT .....................................................................14-28

       A.  STANDARD FOR INJUNCTION

            *1.  Likelihood of Success on the Merits*

       B.  DEFENDANTS STATUTORY VIOLATIONS

       C.  DEFENDANTS CONSTITUTIONAL VIOLATIONS

            *1.  Free Exercise Clause*

            *2.  Right to Privacy*

       D.  PLAINTIFFS ARE LIKELY TO SUFFER IRREPARABLE HARM

       E.  BALANCE OF EQUITIES FAVORS PLAINTIFF

       F.  INJUNCTION IS IN THE PUBLIC INTEREST

VI.    CONCLUSION…………………………………………………….29-30

**TABLE OF AUTHORITIES**

| CASES | PAGE(S) |
|---|---|
| *Am. Trucking Ass'ns v. City of Los Angeles,*<br>*559 F.3d 1046, 1052 (9th Cir. 2009)* | 16 |
| *Burwell v. Hobby Lobby Stores, Inc., 573 U.S. 682 (2014)* | 29 |
| *Cantwell v. Connecticut, 310 U.S. 296, 303 (1940)* | 14,21 |
| *Carey v. Population Servs. Int'l, 431 U.S. 678, 684 (1977)* | 27 |
| *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*<br>*508 U.S. 520 (1993)* | 15, 21-24 |
| *Clements v airport Authority of Washoe County, 69 F.3d 321 (9th Cir. 1995)* | 15 |
| *Colo. Christian Univ. v. Weaver, 534 F.3d 1245(10th Cir. 2008)* | 24 |
| *Edge v. City of Everett, 929 F.3d 657, (9th Cir. 2019)* | 14 |
| *Elrod v. Burns, 427 U.S. 347, 373 (1976)* | 28 |
| *Emp't Div., Dep't of Human Res. Of Oregon v. Smith, 494 U.S. 872, (1990)* | 15, 21 |
| *Ex Parte Young*, 209 U.S. 123 (1908) | 6 |
| *Free the Nipple v, City of Ft. Collins, Colo, 916 F.3d 792 (2019)* | 29 |
| *First Baptist Church v Gov. Laura Kelly*<br>*USDC Dist. Kansas Case 6:20-cv-01102-JWB-GEB* | 7 |
| *Hobby Lobby Stores, Inc. v. Sebelius, 723 F.3d 1114, (10th Cir. 2013)* | 29 |
| *Int'l Molders' & Allied Workers' Local Union v. Nelson,*<br>*799 F.2d 545 (9th Cir. 1986).* | 14 |
| *Marsh v. County of San Diego, 680 F.3d 1148 (9th Cir. 2012)* | 27 |
| *Maryville Baptist Church, Inc. v. Beshear, No. 20-5427 (6th Cir. 2020)* | 7 |
| *Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214, (11th Cir. 2004)* | 24 |
| *On Fire Christian Ctr., Inc. v. Fischer, No. 3:20-CV-264-JRW,*<br>*2020 WL 1820249 (W.D. Ky. Apr. 11, 2020).* | 25 |

*Personnel Administrator v. Feeney, 442 U.S. 256 (1979)*    21

*Reynolds v. United States, 98 U.S. 145 (1878)*    21

*Roe v. Taber 410 U.S. 113, 152, (1973)).*    27

*Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, (2000)*    15,20

*Shanks v Dessel, 540 F.3d 1082, 1090 (9th Cir. 2008).*    16

*Shrum v. City of Coweta, 449 F.3d 1132, (10th Cir. 2006)*    24

*Sherbert v. Verner, 374 U.S. 398 (196)*    21,23

*Sierra Forest Legacy v. Rey, 577 F.3d 1015 (9th Cir. 2009)*    15

*Sw. Voter Registration Educ. Project v. Shelley, 344 F.3d 914 (9th Cir. 2003)*    15

*Tabernacle Baptist Church, Inc. of Nicholasville, Kentucky v. Beshear, N. 3:20-cv-00033-GFVT (E.D. Ky. May 8, 2020)*    8

*Thomas v. Review Bd. of the Ind. Emp't Sec. Div., 450 U.S. 707 (1981)*    21

*United States v. California, 921 F.3d 865, 877 (9th Cir. 2019).*    15

*United States v. Lee, 455 U.S. 252, 263 n.3 (1982)*    21

*USDC Dist. Kansas Case 6:20-cv-01102-JWB-GEB First Baptist Church v Gov.    Laura Kelly*    6

*Washington v. Davis, 426 U.S. 229, 246 (1976).*    21

*Washington v. Glucksberg, 521 U.S. 702, 720–21 (1997)*    27

*Whalen v. Roe, 429 U.S. 589, 599–600 (1977)*    27

*Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, (2008)*    14-16, 28

*Wisconsin v. Yoder, 406 U.S. 205 (1972);*    21

**STATUTES**

A.     NRS 199.280

B.     NRS 202.450,

1    C.    NRS 233B.066

2    D.    NRS 233B.0613

3    E.    42 U.S.C. §1983

4    F.    U.S. Const. Amends. I, XIV

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MOTION FOR PRELIMINARY INJUNCTION

COME NOW, PLAINTIFFS, CALVARY CHURCH LONE MOUNTAIN, by and through the undersigned attorneys of record, SIGAL CHATTAH, ESQ., of the CHATTAH LAW GROUP, and JOSEPH S. GILBERT, ESQ., of JOEY GILBERT LAW, and pursuant to Fed. R. Civ. Pro. 65, hereby move this Court for a preliminary injunction against Defendants, to enjoin them from enforcing the Emergency Directives and Emergency Regulations, etc.

To Wit[1]:

1. Emergency Directive 20-003;

2. Emergency Directive 20-006;

3. Emergency Directive 20-007;

4. Emergency Directive 02-010;

5. Emergency Directive 20-013;

6. March 20, 2020 Emergency Regulation; and

The purpose of this motion made on an emergency basis, given the fact that it has been two weeks since Defendants have declared the State of Nevada has been in Phase I Opening and religious institutions have been patiently waiting for Defendants to recognize the Free Exercise Clause.

On May 14, 2020, Plaintiff along with 190 other Churches in Nevada attempted to resolve the matter with sending the Governor with a correspondence prior to taking a action, whereby the Governor categorically ignored pleas from religious institutions to reopen places of worship in Nevada[2]

---

[1] *See May 14, 2020 corr. attached hereto as Exhibit "1".*
[2] *See 3/20/20 Emergency Regulation and Emergency Directives attached hereto attached hereto as Exhibit "2".*

6

Plaintiffs' Motion is based upon the pleadings and papers on filed herein, the Declaration of Pastor Jimmy Morales and the Exhibits and Declarations filed concurrently herewith, and the following points and authorities.

## JURISDICTION

This court has subject matter jurisdiction over Plaintiffs' claims arising under federal law pursuant to 42 U.S.C. §1983.  Plaintiffs further allege that the exercise of this court's jurisdiction over such claims is proper under the rule of *Ex Parte Young, 209 U.S. 123 (1908)* (plaintiff alleging violation of federal law may seek prospective injunctive relief against responsible state official).

## PROCEDURAL POSTURE

In the wake of the novel coronavirus, the State of Nevada Executive Administrators and their Agencies, hastily instituted a series of state and county-wide orders (the "Orders") to stem the spread of COVID-19.  As well-intentioned as these Orders are with respect to the general public's health, safety and welfare, they have come at a steep price with respect to the complete and utter restraint on Nevadans' civil rights and liberties.

Other States who have enacted similar restrictions have been found by those State Courts and United States District Courts to have violated the Free Exercise Clause of the Constitution; with many states subsequently loosening restrictive orders on places of worship. Defendants for the State of Nevada refused to do so.

The following Federal and State Cases have held that their Respective Governor's restrictive orders was deemed unconstitutional.

*First Baptist Church v Gov. Laura Kelly*
*USDC Dist. Kansas Case 6:20-cv-01102-JWB-GEB*

*Maryville Baptist Church, Inc. v. Beshear, No. 20-5427*
*(6th Cir. 2020)*

7

*Tabernacle Baptist Church, Inc. of Nicholasville, Kentucky v. Beshear, N. 3:20-cv-00033-GFVT (E.D. Ky. May 8, 2020)*

Plaintiffs' Emergency Motion for Preliminary Injunction follows said precedents, accordingly.

## **STATEMENT OF FACTS**

This action challenges the constitutionality of Defendants' Orders to curb Plaintiffs' civil rights and liberties by ordering draconian "shelter-in-place" orders and effectively shuttering so-called "Non-Essential" businesses all across the State of Nevada. If allowed to stand, Defendants' Orders will not only continue to violate Plaintiffs' rights under both the Nevada and U.S. Constitutions, but will continue to inflict massive and widespread economic damage to Plaintiffs—all while unconstitutionally placing the burden of Defendants' respective Orders on the backs of both small and large "Non-Essential" businesses—such as those of Plaintiffs and places of worship.

Indeed, some of these Plaintiffs' "Non-Essential" businesses include places of worship forced to close. The stakes for immediate relief from this Court for Plaintiffs could not be higher. Accordingly, Plaintiffs bring this action challenging the Constitutionality of Defendants' Orders, which have deprived them of numerous rights and liberties under both the U.S. and Nevada Constitutions.

In doing so, Plaintiffs seek: (1) equitable and injunctive relief to enjoin the enforcement of Defendants' Orders; (2) declaratory relief from this Court in declaring that Defendants' Orders violate Plaintiff's civil rights under: (a) 42 U.S.C. §1983 of the Federal Civil Rights Act ("Section 1983"), (b) the Due Process and (c) Equal Protection Clauses of the 5th and 14th Amendments, and (d) Article 1 and 5 of the Nevada Constitution; (3) attorney's fees and costs for the work done by Plaintiffs' counsel in connection with this

lawsuit in an amount according to proof; and (4) for such other and further relief as the Court deems just and appropriate.

## A.    DESCRIPTION OF ACTION

The global COVID-19 pandemic brought on by the Wuhan Coronavirus has caused catastrophic and unprecedented economic damage across the globe, and with it, significant loss of life and fundamental changes to both world and national economies, and in specific, the manner in which businesses are permitted to run, if at all.

To be sure, State and U.S. officials have faced tremendous adversity in planning, coordinating, and at times executing effective nationwide and statewide policies to protect the general public's health, safety and welfare during this time of crisis.

However, these policies, as well-intentioned as they may be, have had an unlawful and disparate effect on some people and their businesses over other people and their businesses to the point where life, liberty and the pursuit of happiness has been ripped away from law-abiding citizens and businesses.

On or about March 13, 2020, President of the United States (POTUS) Donald J. Trump proclaimed a National State of Emergency as a result of the threat of the emergence of COVID-19. On March 16, 2020, POTUS announced "15 Days to Slow the Spread"-Coronavirus Guidelines for America based on the Center for Disease Control recommendations.

POTUS did not issue a Federal Mandate and recommendations were made and based on the Center for Disease Control (CDC) and Institute of Health Metrics and Evaluation (IHME) Covid-19 projections. Over the course of the subsequent 30 days, it became very clear that both the CDC and the IHME Covid-19 projections were grossly over-exaggerated.

Since the initial outbreak of COVID-19 in the United States in February, March, April and May 2020, the Federal Government's projections of the anticipated national death toll related to the virus have decreased substantially, by an order of magnitude. Despite such revisions, Defendants have increasingly restricted—where not outright banned— Plaintiffs' engagement in constitutionally-protected activities.

**B.**      **DEFENDANTS' DIRECTIVES AND POLICIES TOWARDS COVID-19**

On March 12, 2020, Governor Sisolak issued a Declaration of Emergency and related directives following the COVID-19 Pandemic, ordering all non-essential business to cease operations. Said directive ordered essential businesses to follow additional guidelines to reduce the likelihood of transmitting COVID-19. On March 17, 2020, Sisolak directed Nevadans to implement physical distancing measures to minimize spread of COVID -19.

On Or about March 20, 2020, Governor SISOLAK, in joint action with the Department of Public Safety, Division of Emergency Management adopted emergency regulation as a result of the COVID -19 pandemic. Pursuant to same, the Nevada Administrative Code Chapter 414 was amended to include and define essential and non -essential businesses.

NRS 233B.066.2 mandates that a concise explanation of the need a for the adopted regulation be provided along with the estimated economic effect, both immediate and long-term effect. NRS 233B.006.2 further mandates that the estimated cost to the agency for enforcement of the regulation, and if the regulation provisions are more stringent than a federal regulation, a summary is required.

Both Defendants Sisolak and Luna, Chief Nevada Division of Emergency Management instructed that the regulation that provides more stringent regulation than the federal regulation of the same activity was not applicable.

10

Defendants Sisolak and Luna's March 20, 2020 Order is a gross misrepresentation of the stringent measures taken by same, and is a violation of the requirements by NRS 233B.066(1)(j). Defendants Sisolak and Luna, deliberately, willfully, and with a conscious disregard for the truth violated NRS 233B.066(1)(j) by refusing to delineate the stringent measures that the State of Nevada was incorporating, despite no federal mandate for same.

Sisolak's March 24, 2020 Directive 007 provided the following:

\*      The Nevada general public shall not gather in groups of ten or more in any indoor or outdoor area, whether publicly owned or privately owned where the public has access by right or invitation, express or implied, whether by payment of money or not, including without limitation, parks, basketball courts, volleyball courts, baseball fields, football fields, rivers, lakes, beaches, streets, convention centers, libraries, parking lots, and private clubs. This provision shall not be construed to apply to the gathering of persons living within the same household, or persons working at or patronizing Essential Licensed Businesses or providing essential services to the public.

\*      With the exception of persons residing in the same household, the Nevada general public shall, to the extent practicable, abide by social distancing practices by maintaining a minimum six-foot distance between persons in public spaces, whether privately or publicly owned.

\*      Local governments shall limit the Nevada general public's use of recreational equipment, including without limitation, playground equipment, basketball courts, volleyball courts, baseball fields, beaches, or football fields, in a manner that causes the congregation of ten or more persons in a manner contrary to best COVID-19 disease mitigation social distancing practices

Directive 007 also threatened that any person who does not comply with Section 1 of said Directive, after receiving notice from law enforcement, may be subject to criminal prosecution and civil penalties under NRS 199.280, NRS 202.450, and another other applicable statute, regulation, or ordinance.

The Directive also instructed that All law enforcement agencies in the State of Nevada were authorized to enforce this Directive and that the Office of the Attorney General is given concurrent jurisdiction to prosecute violations of this Directive.

On March 29, 2020, Donald J. Trump, President of the United States, recommended the continuation of limitations on gatherings through April 30, 2020,

On March 31, 2020, Sisolak issued Emergency Directive 010 which ordered Nevadans to stay in their residences. Gatherings of individuals outside the home is prohibited but- for authorized outdoor activity, so long as the activity complies with Emergency Directive 7.

On April 8 2020, Emergency Directive 013 provided the following closures:

\*      Publicly accessible sporting and recreational venues that encourage social congregation, including without limitation, golf courses, golf driving ranges, tennis courts, basketball courts, volleyball courts, skate parks, bocce ball courts, handball courts, horseshoe pits, or pickleball courts, shall remain closed for the duration that this Directive is in effect.

\*      Places of worship shall not hold in-person worship services where ten or more persons may gather, including without limitation, drive-in and pop-up services, for the remainder of the Declaration of Emergency.

While "Essential" businesses continue to operate, and indeed, turn a profit (if not historical profits) during this time of crisis, Plaintiffs' "Non-Essential" businesses, including places of worship have suffered immeasurably at the hands of government overreach and unconstitutionally restrictive orders passed and enforced by Defendants which have had immense disparate impact across every segment or sector of worship in the State of Nevada.

Accordingly, Plaintiffs complain against Defendants, and each of them, for violation of the Federal Civil Rights Act, 42 U.S.C. Section 1983 ("FCRA"), to declare and enjoin the enforcement of the following orders:

a.      Defendant Sisolak's Emergency Directive 007 issued on March 24, 2020, Nevadans from gathering in groups of more than 10 people.

b.      Defendant Sisolak's Executive Directive 010 Stay At Home Order issued on March 24, 2020;

b.      Defendant Division of Emergency Management's designation of "Essential Licensed Business" and "Non-Essential Business" as delineated in Chapter 414 of the NAC.

c.      Defendant Sisolak's Executive Directive 013 issued on April 8, 2020 ("Executive Order 013"), prohibiting places of worship services where ten or more persons may gather

On May 7, 2020, Defendants arbitrarily directed Nevada to enter into Phase I of business reopening, but still preclude congregation of individuals at religious institutions, including but not limited to churches, synagogues, and mosques in the State of Nevada.

13

# LEGAL AUTHORITY

**A.   STANDARD FOR INJUNCTION**

A motion for a preliminary injunction is governed by the multi-factor test outlined by the Supreme Court in *Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 20 (2008)*. Under the *Winter* test, the plaintiff has the burden to establish: (1) likelihood of success on the merits; (2) that the plaintiff is likely to suffer irreparable harm if the preliminary injunction is not granted; (3) that the balance of equities favors the plaintiff; and (4) that the injunction is in the public interest. *Id.* Likelihood of success on the merits is a threshold inquiry and the most important factor. *See, e.g., Edge v. City of Everett, 929 F.3d 657, 663 (9th Cir. 2019)*.

Alternatively, a court may grant the injunction if the plaintiff demonstrates either a combination of probable success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in his favor. *NRDC v. Winter, 518 F.3d at 677 (internal citations omitted)*.[3]

In our circuit, there is no presumption that the issuance of a preliminary injunction requires an evidentiary hearing. *See Int'l Molders' & Allied Workers' Local Union v. Nelson, 799 F.2d 547, 555 (9th Cir. 1986)*.

---

[3] Justice Ginsburg penned an eloquent dissent in *Winter*, where, among other things, she addressed the question of whether the majority opinion eviscerated a court's ability to issue an injunction when the likelihood of irreparable harm was less than clear: Consistent with equity's character, courts do not insist that litigants uniformly show a particular, predetermined quantum of probable success or injury before awarding equitable relief. Instead, courts have evaluated claims for equitable relief on a "sliding scale," sometimes awarding relief based on a lower likelihood of harm when the likelihood of success is very high.... This Court has never rejected that formulation, and I do not believe it does so today. *Id.* at 392 (Ginsburg, J. dissenting) (internal citations omitted).

14

Review a grant of a preliminary injunction for abuse of discretion. *See, e.g., United States v. California, 921 F.3d 865, 877 (9th Cir. 2019)*. "The district court's interpretation of the underlying legal principles, however, is subject to de novo review and a district court abuses its discretion when it makes an error of law." *Sw. Voter Registration Educ. Project v. Shelley, 344 F.3d 914, 918 (9th Cir. 2003) (en banc)*.

### 1.     *Likelihood of Success on the Merits*

Plaintiffs are likely to prevail on the merits, or at least have raised a serious question to the merits of their procedural and substantive due process claims against Defendants.

To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must show the deprivation of a federal right by a person acting under color of state law. The First Amendment provides in part that "Congress shall make no law ... prohibiting the free exercise" of religion. U.S. Const. Amend. I. The First Amendment applies to the States by virtue of the Fourteenth Amendment. *Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 301 (2000)*.

The Governor's restriction on in-person worship services likely "prohibits the free exercise" of "religion" in violation of the First and Fourteenth Amendments. *U.S. Const. amends. I, XIV; Cantwell v. Connecticut, 310 U.S. 296, 303 (1940)*. On one side of the line, a generally applicable law that incidentally burdens religious practices usually will be upheld. *See Emp't Div., Dep't of Human Res. Of Oregon v. Smith, 494 U.S. 872, 878–79 (1990)*. On the other side of the line, a law that discriminates against religious practices usually will be invalidated because it is the rare law that can be "justified by a compelling interest and is narrowly tailored to advance that interest." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 553 (1993)*.

The Ninth Circuit has repeatedly stated that "[t]o obtain relief on a procedural due process claim, the plaintiff must establish the existence of (1) a liberty or property interest

protected by the constitution; (2) a deprivation of the interest by the government; 3) lack of process." *See Shanks v Dessel, 540 F.3d 1082, 1090 (9th Cir. 2008).* Procedural due process concerns are not satisfied simply by providing notice and a hearing. The Ninth Circuit has firmly ruled that procedural due process is violated when an adjudicative decision maker deprives a person of protected property interests on the grounds of bias, prejudice, partiality, or maliciousness, regardless of whether there was notice and/or a hearing. *Clements v Airport Authority of Washoe County, 69 F.3d 321, 333 ( 9th Cir. 1995).*

In *American Trucking Associations v. City of Los Angeles*, the Ninth Circuit referenced *Winter* in its application of the traditional test and held that "as the Court explained, an injunction cannot issue merely because it is possible that there will be an irreparable injury to the plaintiff; it must be likely that there will be." *See Am. Trucking Ass'ns v. City of Los Angeles, 559 F.3d 1046, 1052 (9th Cir. 2009) (emphasis added).*

The Supreme Court made clear in *Winter* that the balancing of harms, and review of the public interest, must occur in the context of the specific relief requested. *Winter v. Natural Res. Def. Council (Winter), 129 S. Ct. 365, 376 (2008).* This approach was applied by the Ninth Circuit in *Sierra Forest Legacy v. Rey*, when it overturned a district court's denial of preliminary injunctive relief for failure to analyze the balancing of harms and public interest in the context of the narrow injunction requested by environmental plaintiffs. *Sierra Forest Legacy v. Rey, 577 F.3d 1015, 1022–23 (9th Cir. 2009) (citations omitted) ("When deciding whether to issue a narrowly tailored injunction, district courts must assess the harms pertaining to injunctive relief in the context of that narrow injunction.").*

**B.    DEFENDANTS' NEVADA STATUTORY VIOLATIONS**

Defendants have engaged in a series of statutory violations with regards to each and every Executive Directive issued as stated *infra.*

1. **Defendants Failure to Comply with the Statutory Mandate of NRS 233B.066(2) Remains Violative of the Legislative Intent of Said Statute**

NRS 233B.066(2) mandates that each adopted regulation be accompanied by: (i) a clear and concise explanation of the need a for the adopted regulation; (ii) the estimated economic effect of the regulation on the business which it is to regulate and on the public, which shall be stated separately, and in each case must include: (1) both adverse and beneficial effects; and (2) both immediate and long term effects; (iii) the estimated cost to the agency for enforcement of the proposed regulation; (iv) a description of any regulations of other state or government agencies which the proposed regulation overlaps or duplicates, a statement explaining why the duplication or overlapping is necessary, and if the regulation duplicates or overlaps a federal regulation, the name of the regulating federal agency; (v) if the regulation includes provisions which are more stringent than a federal regulation which regulates the same activity, a summary of such provisions; and (vi) if the regulation provides a new fee or increases an existing fee, the total annual amount the agency expects to collect and the manner in which the money will be used. *See* NRS 233B.066.

    (a)   *March 20, 2020 Emergency Regulation*

On March 20, 2020, Defendant Governor Sisolak, in joint action with Defendant Department of Public Safety, Division of Emergency Management, adopted an emergency regulation ("March 20 Emergency Regulation") amending Chapter 414 of the Nevada Administrative Code to define "Essential Businesses" and "Non-Essential Businesses", whereby "Non-Essential Businesses" were to cease operations until April 16, and where "Essential Businesses" were authorized to remain open so long as strict guidelines were followed to reduce the likelihood of transmitting COVID-19. Specifically, adequate social

distancing, contactless payments when possible, and delivery only for retail cannabis dispensaries ("Emergency Directive 003").

Both Defendants Governor Sisolak and Luna endorsed the March 20 Emergency Regulation amending Chapter 414 of Nevada Administrative Code, and in its accompanying Informational Statement as required by NRS 233B.066(2), affirmed that: (i) there was no economic effect of the regulation on the businesses which it is to regulate; (ii) there was no economic effect of the regulation on the general public which it is to regulate; (iii) there was no estimated cost to the agency for enforcement of the regulation; (iv) the regulation did not overlap or duplicate a federal regulation; (v) the regulation does not include provisions which are more stringent than a federal regulation which regulates the same activity; and (vi) the regulation does not establish a new fee or increase an existing fee.

The affirmations made by Defendants Governor Sisolak and Luna in the March 20, 2020 Informational Statement are a gross misrepresentation of the stringent measures taken and are a direct violation of subsections (1)(g), (1)(h), (1)(i), and (1)(j) of NRS 233B.066.

In their affirmations, Defendants Governor Sisolak and Luna deliberately, willfully, and with a conscious disregard for the truth, violated:  NRS 233B.066(1)(g) by refusing to provide the estimated economic effect of the regulation on the businesses and persons which it is regulating; NRS 233B.066(1)(h) by refusing to provide the estimated cost to the agency for enforcement of the regulation; NRS 233B.066(1)(i) by refusing to state the federal regulations which the regulation duplicates and the applicable federal agency; and NRS 233B.066(1)(j) by refusing to delineate the stringent measures that the State of Nevada incorporated, despite no federal mandate for the same.

Defendants further violated the contemplated intent of NRS 233B.066 with the passage of every subsequent Executive Directive without even providing the mandated information.

2. **Defendants' Suspension of Open Meeting Laws and Notice Under NRS 241 was and Remains Unlawful and Must be Voided**

Whereby Defendant Ford took no action to prevent or prohibit Defendants Governor Sisolak, Luna, or Department of Public Safety, Division of Emergency Management from adopting the unlawful March 20, 2020 Emergency Regulations, each subsequent Executive Directive, and whereby Defendant Ford took no action to prevent or prohibit Defendant Governor Sisolak, from adopting the unlawful Emergency Regulation, Defendant Ford engaged in willful misconduct, knowing that said mandates of NRS 233.066 were blatantly ignored.

On March 22, 2020, Defendant Governor Sisolak suspended certain provisions contained in Chapter 241 of the Nevada Revised Statute ("Open Meeting Law") until April 16, and specifically, suspending requirements pertaining to public meetings and posting notices at physical locations ("Emergency Directive 006").

Defendants actions lacked any empirical data for which they were based upon. designation of essential vs non-essential business was based on the services the business rendered, not business capacity, public health or empirical data.

Consequently, many essential businesses, including but not limited to, box stores such as grocery stores, Costco, Sam's Club, Target, Home Depot, Lowes, and Walmart were servicing an overwhelming number of patrons, regardless of social distancing guidelines, demonstrating that the Executive Directives were arbitrary and capricious and un-sustained by any empirical data in support thereof.

## C.   CONSTITUTIONAL VIOLATIONS

### *1.   Executive Directive 013 Violates the Free Exercise Clause*

To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must show the deprivation of a federal right by a person acting under color of state law. The First Amendment provides in part C that "Congress shall make no law ... prohibiting the free exercise" of religion. U.S. Const. Amend. I. The First Amendment applies to the States by virtue of the Fourteenth Amendment. *Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 301 (2000).*

On April 8, 2020, Defendant Governor Sisolak continued the following closures, until April 30 ("Emergency Directive 013"):

> Sec. 1.  To the extent this Directive conflicts with earlier Directives
> or regulations promulgated pursuant to the March 12, 2020
> Declaration of Emergency, the provisions of this Directive shall
> prevail.
>
> *Sec. 1-3 Intentionally Omitted.*
>
> Sec. 4.  Places of worship shall not hold in-person worship services
> where ten or more persons may gather, including without limitation,
> drive-in and pop-up services, for the remainder of the Declaration of
> Emergency.  Places of worship may, however, hold worship services
> via alternative means, including, but not limited to, video, streaming,
> or broadcast, provided that any personnel needed to perform tasks
> related to such alternatives do so in a manner that is consistent with
> social distancing guidelines promulgated by the Nevada Health
> Response, the United States Centers for Disease Control and
> Prevention, and all Directives promulgated pursuant to the March 12,

2020 Declaration of Emergency, including without limitation, the

prohibition on gatherings of ten or more persons and maintaining

minimum separation distances of at least six feed between persons.

response to the COVID-19 pandemic.

The First Amendment provides, "Congress shall make no law . . . prohibiting the free exercise" of religion. *U.S. Const., amend. I* This constitutional right applies to state and local governments through the Fourteenth Amendment. *Cantwell v. Connecticut, 310 U.S. 296, 303 (1940).*The Supreme Court has interpreted the Free Exercise Clause in varying ways over the years[4], but our current understanding derives from two cases with facts at opposite ends of a continuum—*Employment Division v. Smith 494 U.S. 872 (1990)* and *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah. 508 U.S. 520 (1993).*

The first prong of the *Smith-Lukumi* test requires courts to determine whether a law is neutral. *Smith* held that "the right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability.' " *494 U.S. at 879 (quoting United States v. Lee, 455 U.S. 252, 263 n.3 (1982) (Stevens, J., concurring)).* If a law is either not neutral or not generally applicable, it must be justified under strict scrutiny and the compelling interest test. *Id. at 884 (reaffirming Sherbert v Verner, 374 U.S. 398(1963)).*

Here Executive Directive 013 is not a valid and neutral law of general applicability. Here the law precludes religious services and gatherings of ten or more people, regardless of whether the capacity to comply with social distancing exists. The arbitrary and capricious

---

[4] *See, e.g., Reynolds v. United States, 98 U.S. 145 (1878)*; *Cantwell*, 310 *U.S. 296*; *Sherbert v. Verner, 374 U.S. 398 (1963)*; *Wisconsin v. Yoder, 406 U.S. 205 (1972)*; *Thomas v. Review Bd. of the Ind. Emp't Sec. Div., 450 U.S. 707 (1981)*

21

nature of not instituting requirements on box stores, grocery stores, construction sites, etc. and

mandating religious institutions to comply with same demonstrates that this is not a law of

general applicability. Here the specification in Executive Directive 20-013 of "places of

worship" indicates *ab initio* that this Directive targets religious activity.

At a minimum, the protections of the Free Exercise Clause pertains if the law at

issue *discriminates against* some or all religious beliefs or regulates or prohibits

conduct *because* it is undertaken for religious reasons. *Lukumi at 532.*

In equal protection and nondiscrimination law, it is settled that a plaintiff may prove

either a facial classification or that a facially neutral law is "a purposeful device to

discriminate *Washington v. Davis, 426 U.S. 229, 246 (1976).* When a challenged rule is

facially neutral, those claiming discrimination may show that the rule was adopted "at least in

part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group.

*Personnel Administrator v. Feeney, 442 U.S. 256, 279 (1979).*

> ### (a) Executive Directive 013 is Subject to Struct Scrutiny Under Both Nevada Law and the State Constitution Because It Substantially Burdens Plaintiffs' Religious Exercise

Executive Directive 20-013 treats religious and secular conduct differently. Secular

business are allowed to open and operate as long as social distancing is practiced, regardless

of how many people can be accommodated and served at same; while places of worship are to

remain closed even if half the capacity is met with social distancing. Therefore, unequal

treatment of religious and secular conduct requires strict scrutiny, whether or not that

inequality is reflected in the text of the challenged law. *Lukumi 508 U.S. at 534.*

The ordinances at issue in *Lukumi*, though facially neutral in some respects, contained

elements that were clearly targeted at religious practices, such as the prohibitions on ritual

sacrifices. And although *Lukumi* dealt with laws that the Court concluded were ultimately

aimed at a particular religious group, the court does not think that the Supreme Court would have excused the First Amendment violations in that case if the offending provisions had been part of a broader set of laws that did nothing to diminish the religious animus that was both explicit and implicit in the provisions targeting the church.

In evaluating neutrality, courts are admonished to "survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders," *Lukumi*, 508 U.S. 534, and, in particular, to consider in that context exceptions or exemptions granted to secular activity that are not extended to religious activity. *See id.at 535-37.*

The principles explained in *Lukumi* indicate that the court should consider the effect of the exemptions in these executive orders when evaluating neutrality. When individualized exemptions from a general requirement are available, the government 'may not refuse to extend that system to cases of 'religious hardship' without compelling reason.'" *Id. at 537* (quotation omitted).

### (b) Executive Directive 013 Fails Strict Scrutiny Standards

In addition to neutrality, the Free Exercise Clause requires that "laws burdening religious practice must be of general applicability." *Lukumi, 508 U.S. at 542.* "The principle that government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief is essential to the protection of the rights guaranteed by the Free Exercise Clause." *Id. at 543.* A law is underinclusive, and thus not generally applicable, when it fails to prohibit secular activity that endangers the same interests to a similar or greater degree than the prohibited religious conduct. *Id.*

A law that fails to satisfy the requirements of neutrality and general applicability is subjected to strict scrutiny. *Id. at 546.* "To satisfy the commands of the First Amendment, a law restrictive of religious practice must advance interests of the highest order and must be

narrowly tailored in pursuit of those interests." *Id.* (internal quotations omitted). When "[t]he proffered objectives are not pursued with respect to analogous non-religious conduct, and those interests could be achieved by narrower ordinances that burdened religion to a far lesser degree," a lack of narrow tailoring invalidates the law. *Id.*

Here Executive Directive 013, is not narrowly tailored to pursue the interests of religious worship. Here, Executive Directive 013, is a blanket prohibition on any places of worship to operate and allow the gathering of ten (10) of more people. Said Directive does not discriminate between religious affiliations, it simply prohibits all religious worship, while allowing secular activities.

### (c) Executive Order 013, Targeting prohibition of Plaintiffs Worship Services Does Have a Real or Substantial Relation to the Public Health Crisis

The constitutional benchmark is "government neutrality," not "governmental avoidance of bigotry." *See Colo. Christian Univ. v. Weaver, 534 F.3d 1245, 1260 (10th Cir. 2008).* A law is not neutral and generally applicable unless there is "neutrality between religion and non-religion." And a law can reveal a lack of neutrality by protecting secular activities more than comparable religious ones. *Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214, 1233–35, 1234 n.16 (11th Cir. 2004); see also Shrum v. City of Coweta, 449 F.3d 1132, 1145 (10th Cir. 2006)* ("[T]he Free Exercise Clause is not confined to actions based on animus.").

The question is whether the Directives amount to "the least restrictive means" of serving these laudable goals. That's a difficult hill to climb, and it was never meant to be anything less. *See Lukumi, 508 U.S. at 546.* There are plenty of less restrictive ways to address these public-health issues. Why not insist that the congregants adhere to social-distancing and

other health requirements and leave it at that—just as the Governor has done for comparable secular activities?

If the State trusts its people to innovate around a crisis in their professional lives, surely it can trust the same people to do the same things in the exercise of their faith. The orders permit uninterrupted functioning of construction on sports arenas and all construction sites.. How are construction sites with social distancing any different from in-person church services with social distancing? Permitting one but not the other hardly counts as no-more-than necessary lawmaking.

Sure, the Church, synagogue or mosque might use Zoom services or the like, as so many places of worship have decided to do over the last two months. But who is to say that every member of the congregation has access to the necessary technology to make that work? Or to say that every member of the congregation must see it as an adequate substitute for what it means when "two or three gather in my Name,*" Matthew 18:20,* or what it means when "not forsaking the assembling of ourselves together," *Hebrews 10:25*; see *also On Fire Christian Ctr., Inc. v. Fischer, No. 3:20-CV-264-JRW, 2020 WL 1820249, at *7–8 (W.D. Ky. Apr. 11, 2020).*

Since the passage of Executive Directive 20-13, all three monotheistic religions have been precluded from practicing in their respective places of worship; the Jewish Faith during Passover *Et. Seq*[5], The Christian Faith during Easter, and the Muslim Faith during Ramadan.

---

[5] Passover holiday calendar commenced on April 8 -16, 2020, followed by Lag Ba'Omer, dated May 12, 2020. Easter holiday calendar commenced with Palm Sunday on April, 5. 2020 followed by Easter on April 12, 2020, while Orthodox Easter was celebrated April 19, 2020. The month-long Holiday Ramadan commenced April 23, 2020 for 30 days until May 23, 2020.

### (d) The State's Decision to Shut Down Places of Worship Is Arbitrary and Capricious

Here, Plaintiffs have made a substantial showing that development of the current restriction on religious activities shows religious activities were specifically targeted for more onerous restrictions than comparable secular activities, such as construction sites, box store grocery markets, pharmacies and large home improvement stores.

The legitimate health and safety concerns arising from people attending religious services inside a church would logically be present with respect to most if not all these other essential activities.

Defendants have not provided that mass gatherings at churches, synagogues or mosques pose unique health risks that do not arise in mass gatherings at airports, offices, and production facilities. Yet the exemption for religious activities has been eliminated while it remains for a multitude of activities that appear comparable in terms of health risks.

The most reasonable inference from this disparate treatment is that the essential function of religious activity was targeted for stricter treatment due to the nature of the activity involved, rather than because such gatherings pose unique health risks that mass gatherings at commercial and other facilities do not, or because the risks at religious gatherings uniquely cannot be adequately mitigated with safety protocols. It is also an arbitrary distinction, in the sense that the disparity has been imposed without any apparent explanation for the differing treatment of religious gatherings.

These facts undermine Defendants' contentions and demonstrate that Executive Directive 20-013 is not a neutral law of general applicability. Instead, it restricts religious practice while failing to "prohibit secular activity that endangers the same interests to a similar or greater degree."

As such, the restriction is likely subject to strict scrutiny, and can be sustained only if it is narrowly tailored to further the compelling state interest in slowing or halting the spread of COVID-19.

### 2. *Defendants Executive Directive  Violate Plaintiffs' Right to Privacy*

The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Fourteenth Amendment's Due Process Clause "specially protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg, 521 U.S. 702, 720–21 (1997) (internal quotation marks and citations omitted).*

The Supreme Court has recognized that "one aspect of the 'liberty' protected by the Due Process Clause of the Fourteenth Amendment is 'a right of personal privacy, or a guarantee of certain areas or zones of privacy.'" *Carey v. Population Servs. Int'l, 431 U.S. 678, 684 (1977) (quoting Roe v. Taber, 410 U.S. 113, 152, (1973)).* This right includes "at least two constitutionally protected privacy interests: the right to control the disclosure of sensitive information and the right to 'independence [in] making certain kinds of important decisions.'" *Fields, 427 F.3d at 1207 (quoting Whalen v. Roe, 429 U.S. 589, 599–600 (1977); see also Marsh v. County of San Diego, 680 F.3d 1148, 1153 (9th Cir. 2012).*

For example, the Defendants' Directives provide for  facilities that are still exempt from the mass gathering prohibition or that are given more lenient treatment, despite the apparent likelihood they will involve mass gatherings, include airports, childcare locations, hotels, food pantries and shelters, detoxification centers, retail establishments (subject to the distancing and "essential function" purpose noted above), retail food establishments, public

27

transportation, job centers, office spaces used for essential functions, and the apparently broad category of "manufacturing, processing, distribution, and production facilities."

As Plaintiffs point out, the exemption for office spaces is broad enough to include such activities as providing real estate services, legal services, but places of worship are prohibited.

**D.     PLAINTIFFS ARE LIKELY TO SUFFER IRREPERABLAE HARM**

To obtain a TRO, Plaintiffs must show they will suffer irreparable harm in the absence of the order. *Winter, 555 U.S. at 20.* The Supreme Court has recognized that "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns, 427 U.S. 347, 373 (1976).*

**E.     BALANCE OF EQUITIES FAVORS PLAINTIFFS**

Plaintiffs must also show that the balance of equities tips in their favor. *Winter, 555 U.S. at 20.* Plaintiffs have shown that they will be harmed by a deprivation of the constitutional right to freely exercise their religion, and that they face a threat of criminal penalties if they violate the current restrictions in EO 20-13.

Plaintiffs recognize that the current pandemic presented an unprecedented health crisis in Nevada, and in this country. The Governor has an immense and sobering responsibility to act quickly to protect the lives of Nevadans from a deadly epidemic.

Keeping in mind that the religious institutions and its congregants just want to be treated equally. They don't seek to insulate themselves from the State's general public health guidelines. They simply wish to incorporate them into their worship services. They are willing to practice social distancing. They are willing to follow any hygiene requirements. They do not ask to share a chalice.

The Governor has offered no good reason for refusing to trust the congregants who promise to use care in worship in just the same way it trusts accountants, lawyers, and construction workers to do the same.

Defendants however fail to demonstrate that if Plaintiffs would abide with social distancing mandates, how such action would substantially interfere with that responsibility. Plaintiffs have shown, however, that they are willing to abide by protocols that have been determined by the Governor to be adequate to protect the lives of Nevadans in the context of other mass gatherings. Therefore, the balance of equities weighs in favor of granting a TRO, pending the preliminary injunction hearing, to permit Plaintiffs to engage in worship services.

## F.   AN INJUNCTION IS IN THE PUBLIC INTEREST

Lastly, to obtain a TRO, Plaintiffs must show that the granting of a TRO is in the public interest. *Winter, 555 U.S. at 20.* The public interest is furthered by preventing the violation of a party's constitutional rights. *Free the Nipple v, City of Ft. Collins, Colo, 916 F.3d 792 (2019).* Additionally, for the reasons previously mentioned, the record shows that allowing Plaintiffs to gather for worship with the safety protocols similar to those applicable to other essential function mass gatherings is consistent with the interest in protecting public health.

"[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Hobby Lobby Stores, Inc. v. Sebelius, 723 F.3d 1114, 1145 (10th Cir. 2013), aff'd' sub nom. Burwell v. Hobby Lobby Stores, Inc., 573 U.S. 682 (2014) (quotations omitted).* This is particularly true for First Amendment freedoms. Because the requested injunction will accomplish this, the public interest also favors an order protecting Plaintiffs.

### CONCLUSION

Plaintiffs don't doubt the Governor's sincerity in trying to do his level best to lessen the spread of the virus or his authority to protect the Nevada's citizens. *See Jacobson v.*

29

*Massachusetts, 197 U.S. 11, 27 (1905).* Plaintiffs also agree that no one, whether a person of faith or not, has a right "to expose the community . . . to communicable disease." *Prince v. Massachusetts, 321 U.S. 158, 166–67 (1944).* But restrictions inexplicably applied to one group and exempted from another do little to further these goals and do much to burden religious freedom. Assuming all of the same precautions are taken, why can someone safely walk down a grocery store aisle but not a pew? And why can someone safely interact with a brave deliverywoman but not with a stoic minister? Defendants have no good answers.

While the law may take periodic naps during a pandemic, we cannot not let it sleep through one. Accordingly, the Court should enter a preliminary injunction enjoining Defendants from enforcement of Emergency Directives 20-003 et seq. or any matter impacting Plaintiffs constitutional interests.

DATED this  21st  day of May 2020.

**CHATTAH LAW GROUP**

/s/ S. CHATTAH
SIGAL CHATTAH, ESQ.
Nevada Bar No.: 8264
CHATTAH LAW GROUP
5875 S. Rainbow Blvd. #203
Las Vegas, Nevada 89118
Tel.:(702) 360-6200
Attorney for Plaintiffs

**JOEY GILBERT LAW**

By: */s Joseph S. Gilbert*
   Joseph S. Gilbert, Esq.
   Roger O'Donnell, Esq
   *Attorneys for Plaintiffs/Petitioners*

30