**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

\* \* \*

| | |
|---|---|
| CALVARY CHAPEL LONE MOUNTAIN | Case No. 2:20-cv-00907-RFB-VCF |
| Plaintiff(s), | **ORDER** |
| v. | |
| STEPHEN F. SISOLAK<br>AARON DARNELL FORD<br>JUSTIN LUNA | |
| Defendant(s). | |

## I.      INTRODUCTION

Before the Court is Plaintiff Calvary Chapel Lone Mountain's Emergency Motion for Preliminary Injunction. ECF No. 11. For the following reasons, the Court denies the motion without prejudice.

## II.      PROCEDURAL BACKGROUND

Plaintiff brought its complaint on May 20, 2020. ECF No. 1. The complaint asserted various federal and state constitutional challenges to Governor Sisolak's emergency directives in response to the COVID-19 pandemic.  Plaintiff filed its motion for a preliminary injunction on May 21, 2020. ECF No. 11. On May 27, 2020, the Court directed that Plaintiff provide a supplement to its motion in light of Governor Sisolak's revised emergency directives allowing places of worship to resume in-person services. ECF No. 13. Plaintiff provided its supplement and Defendants responded. ECF Nos. 15 – 18. The Court held a hearing on the motion on June 9, 2020. This written order now follows.

### III.    FACTUAL BACKGROUND

The Court makes the following findings of fact. Plaintiff Calvary Chapel Lone Mountain is a church located in Las Vegas, Nevada. On May 26, 2020, Defendant Governor Sisolak announced that Nevada would enter "Phase Two" of its reopening. To that end, he issued Emergency Directive 021 on May 28, 2020 (hereinafter the "Emergency Directive" or "Directive"). The Emergency Directive permits several categories of business and social activity to resume, subject to different restrictions. For example, Section 10 of the directive prohibits gatherings in groups of more than fifty in any indoor or outdoor areas. Emergency Directive, § 10. Communities of worship and faith-based organizations are allowed to conduct in-person services so that no more than fifty people are gathered, while respecting social distancing requirements. Id. at § 11. Section 20 similarly limits movie theaters to a maximum of 50 people. Id. at §20. Section 35 of the Emergency Directive allows casinos to reopen at 50% their capacity and subject to further regulations promulgated by the Nevada Gaming Control Board. Id. at § 35.

Calvary argues that the directive treats other secular businesses better than churches, as several other secular businesses are not subject to a fifty-person cap, but instead have an occupancy cap of up to 50% of their building capacity. Such distinctions, Calvary argues, violate Calvary's federal and state constitutional rights.  Calvary therefore seeks an injunction from this Court that would allow Calvary to adopt its own safety plan, which would increase occupancy to 50% of building capacity and allow attendance only by reservation, among other changes. Calvary also desires that the Court "enter an Order adopting guidelines substantiated by empirical data . . . and . . . based on fire code." Pl's Suppl. 11.

-2-

## IV.    LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22 (2008). To obtain a preliminary injunction, a plaintiff must establish four elements: "(1) a likelihood of success on the merits, (2) that the plaintiff will likely suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in its favor, and (4) that the public interest favors an injunction." Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc., 758 F.3d 1069, 1071 (9th Cir. 2014), as amended (Mar. 11, 2014) (citing Winter, 555 U.S. 7, 20 (2008). A preliminary injunction may also issue under the "serious questions" test. Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1134 (9th Cir. 2011) (affirming the continued viability of this doctrine post-Winter). According to this test, a plaintiff can obtain a preliminary injunction by demonstrating "that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor," in addition to the other Winter elements. Id. at 1134–35 (citation omitted).

## V.    DISCUSSION

The Court denies the motion because it does not find that Calvary has demonstrated a likelihood of success on its federal constitutional claims and declines to exercise supplemental jurisdiction over Calvary state constitutional claims.

### a.  Equal Protection

"Under the Equal Protection Clause of the Fourteenth Amendment, all persons similarly situated should be treated alike." Alpha Delta Chi-Delta Chapter v. Reed, 648 F.3d 790, 804 (9th Cir. 2011) (citing City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985)). "A showing that a group was singled out for unequal treatment on the basis of religion," supports a valid equal

protection claim. <u>Alpha Delta</u>, 648 F.3d at 804.

Although the case concerned the applicability of the Free Exercise Clause of the First Amendment rather than an Equal Protection claim, the Supreme Court's decision in <u>South Bay United Pentecostal Church v. Newsom</u> guides this Court's analysis. No. 19A1044, 2020 WL 2813056 (May 29, 2020).

The Free Exercise Clause of the First Amendment provides that "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof." <u>Am. Family Ass'n, Inc v. City & Cty. of San Francisco</u>, 277 F.3d 1114, 1123 (9th Cir. 2002) (citing U.S. Const. amend. I). A regulation or law violates the Free Exercise clause when it is neither neutral nor generally applicable, substantially burdens a religious practice, and is not justified by a substantial state interest or narrowly tailored to achieve that interest. <u>Id</u>. (citing <u>Church of Lukumi Babalu Aye, Inc. v. Hialeah</u>, 508 U.S. 520, 531 – 32 (1993)).

The Constitution principally entrusts "[t]he safety and the health of the people" to the politically accountable officials of the States "to guard and protect." <u>Jacobson v. Massachusetts</u>, 197 U. S. 11, 38 (1905). When state officials "undertake[ ] to act in areas fraught with medical and scientific uncertainties," their latitude "must be especially broad." <u>Marshall v. United States</u>, 414 U. S. 417, 427 (1974).

The Supreme Court examined the relationship between COVID-19 related executive orders and the Free Exercise Clause in its recent order in <u>South Bay</u>. In <u>South Bay</u>, the Supreme Court denied an application for injunctive relief enjoining enforcement of a portion of the California governor's executive order to limit the spread of COVID-19. <u>Id</u>. The order limited attendance at places of worship to 25% of building capacity or a maximum of 100 attendees. <u>Id</u>. at 1. The Supreme Court found that the restrictions appeared consistent with the Free Exercise Clause of the

First Amendment. Id. Chief Justice Roberts first noted that "[s]imilar or more severe restrictions apply to comparable secular gatherings, including lectures, concerts, movie showings, spectator sports, and theatrical performances, where large groups of people gather in close proximity for extended periods of time." Id. Chief Justice Roberts then explained that the "[o]rder exempts or treats more leniently only dissimilar activities, such as operating grocery stores, banks or laundromats, in which people neither congregate in large groups nor remain in close proximity for extended periods." Id. Finally, Chief Justice Roberts concluded that, "[t]he precise question of when restrictions on particular social activities should be lifted during the pandemic is a dynamic and fact-intensive matter subject to reasonable disagreement," and that when elected officials "act in areas fraught with medical and scientific uncertainties," their latitude "must be especially broad." Id. (internal citations omitted). "When those broad limits are not exceeded, they should not be subject to second-guessing by an "unelected federal judiciary, which lacks the background, competence and expertise to assess public health and is not accountable to the people." Id.

The Court finds  the holding in South Bay applicable to this case. The Court finds the Emergency Directive is neutral and generally applicable and therefore does not give rise to a valid equal protection claim. Consequently, the Court finds that Plaintiff has not demonstrated a likelihood of success on the merits of its claim.

Calvary argues that the Defendants in this case, based upon the plain language of the Emergency Directive, have violated the First Amendment by 'exceeding the limits' of their authority during a public health crisis. Calvary bases its argument on alleged differential treatment between itself and other secular organizations/activities. Calvary points to several secular businesses that it insists engage in comparable activity in which people gather in large groups and remain in close proximity for large periods of time, including casinos, restaurants, nail salons,

massage centers, bars, gyms, bowling alleys and arcades, all of which are allowed to operate at 50% of official fire code capacity. Calvary specifically focuses on casinos. Given that any social behavior increases the risk of covid-19 transmission, Calvary argues, there is no scientific or medical reason to distinguish between places of worship and other comparable activities.

The Court agrees that church services may in some respects be similar to casinos, in that both are indoor locations in which a large number of people may remain in close proximity for an extended period of time. The Court, however, disagrees that casinos are actually treated more favorably than places of worship. During this phased reopening of Nevada by the Governor, casinos are subject to substantial restrictions and limitations required by the Nevada Gaming Control Board which exist *in addition* to and in conjunction with the requirements and oversight provided by the Emergency Directive. See Emergency Directive, § 35; Addendum to April 21, 2020 Policy Memorandum posted May 29, 2020; 2020-30 Updated Health and Safety Policies for Reopening after Temporary Closure posted May 27, 2020; Health and Safety Policy for the Resumption of Gaming Operations Nonrestricted Licensees posted May 27, 2020; Procedures for Reopening after Temporary Closure Due to COVID-19 posted April 21, 2020, Gaming Control Board. Such additional regulatory policies set forth requirements related not only to the social distancing and placement of table games or slot machines in the casino, for example, but they also set forth requirements regarding training of the employees, financial operations and other internal operations of casinos. Id. These casinos are also subject to regular and explicit inspection of all aspects of the respective casino's reopening plan. Id. Indeed, gaming companies are one of the few categories of organizations in which the directive specifically discusses enforcement and punishment alternatives for violating the directive and concomitant promulgated regulations. Emergency Directive, §35.  Casinos are therefore subject to heightened regulation and scrutiny

-6-

under these guidelines in comparison to churches, regardless of the difference in occupancy cap. The Court finds that while Plaintiffs focus on the fifty-person cap for their clients, they fail to consider the totality of restrictions placed upon casinos in their comparative analysis. Thus, even if the Court were to accept casinos as the nearest point of comparison for its analysis of similar activities and their related restrictions imposed by the Governor, the Court would nonetheless find that casinos are subject to much greater restrictions on their operations and oversight of their entire operations than places of worship.

The Court also finds that other secular entities and activities similar in nature to church services have been subject to similar or more restrictive limitations on their operations. The Court notes that church services consist of activities, such as sermons and corporate worship, that are comparable in terms of large numbers of people gathering for an extend period of time to lectures, museums, movie theaters, specified trade/technical schools, nightclubs and concerts. All of these latter activities are also subject to the fifty-person cap or remain banned altogether under Emergency Directive. See Emergency Directive, §§ 20, 22, 27, 30, 32. Given that there are some secular activities comparable to in-person church services that are subject to more lenient restrictions, and yet other activities arguably comparable to in-person church services that are subject to more stringent restrictions, the Court cannot find that the Emergency Directive is an implicit or explicit attempt to specifically target places of worship. Lukumi, 508 U.S. at 534 (striking down city council ordinance that specifically targeted and forbid animal sacrifices made by a particular religious group). Additionally, whether a church is more like a casino or more like a concert or lecture hall for purposes of assessing risk of COVID-19 transmission is precisely the sort of "dynamic and fact-intensive" decision-making "subject to reasonable disagreement," that the Court should refrain from engaging in. South Bay, 2020 WL 2813056, at 1. As the Court finds

-7-

that the Emergency Directive is neutral and generally applicable, there is no actionable facial Equal

Protection Claim, and Calvary has therefore not demonstrated a likelihood of success on the merits

of this claim.

### b. As-Applied Equal Protection Challenge: Selective Enforcement

Calvary also brings an as-applied challenge. Specifically, Calvary points to what it alleges

is a lack of enforcement of the section of the Emergency Directive banning more than 50 people

from gathering, whether inside or outside, during recent protests. But in order to demonstrate

selective enforcement, it is not enough for Calvary to demonstrate that the directive is not being

enforced against secular activities. Calvary must also demonstrate that Defendants are *only or

primarily enforcing* the directive against places of worship. See Stormans, Inc v. Wiseman, 794

F.3d 1064, 1083 (9th Cir. 2015) (finding no evidence of selective enforcement against religiously

affiliated pharmacies in enforcement of drug delivery rules). In its briefing Calvary alleges that the

Attorney General's office stated that arrests would be made if the church was to exceed its fifty

person-cap. But this allegation is not supported by admissible evidence in the form of a declaration

by someone with personal knowledge of the events and Defendants dispute the validity of

Calvary's stated version of events. Absent more evidence from Calvary that Defendants have

actually enforced Emergency Directive only against places of worship, the Court cannot find that

Calvary has a likelihood of success on the merits of its as-applied Equal Protection challenge.   If

Calvary does in fact have evidence of a pattern of selective enforcement against it, nothing in this

order shall prohibit it from returning to the Court with that evidence and filing a new motion for a

preliminary injunction.

### c. Right to Travel Fifth Amendment

"The Fifth Amendment right to travel protects the right of a citizen of one state to enter and to leave another state, the right to be treated as a welcome visitor rather than an unfriendly alien when temporarily present in the second state, and for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State." Saenz v. Roe, 526 U.S. 489, 500 (1999).

The Court finds that Plaintiff has raised no cognizable right to travel claim based on the facts alleged in the complaint and in the motion for preliminary injunction, and therefore does not find a likelihood of success on the merits of this claim and does not find it to be a valid ground on which to grant the injunction.

### d. Fifth and Fourteenth Amendment Due Process Claims

Calvary's final federal constitutional claim[1] is a Fifth and Fourteenth Amendment due process claim. The Court also finds that Calvary has failed to demonstrate a likelihood of success on the merits of its due process claim. The Supreme Court in Jacobson v. Massachusetts, and more recently in South Bay, has made clear that the state has broad authority to pass emergency measures to protect public health, and will not upset that authority absent clear excess of constitutional boundaries. 197 U.S. 11, 38 (1905). Because the Court finds for the reasons stated above that the Emergency Directive  is a valid use of state police power, it finds that there is no due process violation.

//

---

[1] Plaintiff also raised a Takings Claim in the complaint but did not brief it in the preliminary injunction briefing. Pl.'s Compl. at 24.  The Court therefore declines to address the claim.

### e.  State Constitutional Claims

Calvary also brought several state constitutional claims. The Court is extremely reluctant to order injunctive relief based on its construction of state law issues that have not been presented to the Nevada Supreme Court, especially as the Court has already determined that Calvary has no likelihood of success on any of its federal claims. See 28 U.S.C. § 1367(c)(2) (noting that federal court may decline to exercise supplemental jurisdiction if the claim raises a novel or complex issue of State law). For this reason, the Court declines to assert supplemental jurisdiction over Calvary's state law claims.

## VI.     CONCLUSION

**IT IS THEREFORE ORDERED** that Plaintiff Calvary Chapel Lone Mountain's Emergency Motion for Preliminary Injunction (ECF No. 11) is DENIED.

DATED June 11, 2020.

_____

**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**

-10-